## In re CURRENCY CONVERSION FEE ANTITRUST LITIGATION.

### Nos. MDL 1409, M 21–95.

United States District Court,
S.D. New York.

Oct. 15, 2004.

---

21. *See id.* at 19–20.

Amelia F. Burroughs, Lerach, Coughlin, Stoia, Geller, Rudman & Robbins LLP, San Diego, CA, Christopher Burke, Lerach, Coughlin, Stoia & Robbins, LLP, San Diego, CA, David J. Bershad, J. Douglas Richards, Michael M. Buchman, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., New York City, David A. Langer, Berger & Montague, P.C., Philadelphia, PA, Bonnie E. Sweeney, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., San Diego, CA, Dennis Stewart, Hulett, Harper Stewart LLP, San Diego, CA, Merrill G. Davidoff, Berger & Montague, P.C., Philadelphia, PA, Linda P. Nussbaum, Cohen, Milstein, Hausfeld & Toll, P.L.L.C., New York City, David A. Searles, Donovan Searles, L.L.C., Philadelphia, PA, Francis O. Scarpulla, Law Offices of Francis O. Scarpulla, San Francisco, CA, Michael D. Donovan, Donavan Searles, LLC, Philadelphia, PA, Richard D. Greenfield, Greenfield & Goodman L.L.C., Paoli, PA, Edward W. Millstein, Berger & Montague, P.C., Joseph C. Kohn, Kohn, Swift & Graf, P.C., Philadelphia, PA, Scott Palmer, Berman, DeValerio, Pease, Tabocco, Burt & Pucillo, West Palm Beach, FL, William E. Hoese, Kohn, Swift & Graf, P.C., Philadelphia, PA, Ann D. White, Mager, White & Goldstein, LLP, Jekintow, PA, David Michael Menditto, Macey, Chern & Diab, Chicago, IL, Kerry L. Kessler, Arlington Heights, IL, Malik R. Diab, Thomas George Macey, Macey, Chern & Diab, Casandra Lucchesi, Cathleen M. Combs, Daniel A. Edelman, James O. Latturner, Adela C. Lucchesi, Edelman, Combs & Latturner, Chicago, IL, G. Oliver Koppell, Sheldon V. Burman, Law Offices of Sheldon V. Burman, New York City, Lesley E. Weaver, Patrick J. Coughlin, Milberg, Weiss, Bershad, Hydnes & Lerach, L.L.P., San Francisco, CA, Frank J. Janecek, Tor Gronborg, Milberg, Weiss, Bershad, Hynes & Lerach, L.L.P., San Diego, CA, for plaintiffs.

Brian Brosnahan, Heller, Ehrman, White & McAuliffe, San Francisdo, CA, Daniel Dov Edelman, Heller, Ehrman, White & McAuliffe, LLP, New York City, David H. Marion, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Joseph B.G. Fay, Morgan, Lewis & Bockius LLP, Philadelphia, PA, Lawrence Jay Zweifach, Heller, Ehrman, White & McAuliffe LLP, New York City, M. Laurence Popofsky, Robert P. Mahnke, Scott A. Westrich, Stephen V. Bomse, Heller, Ehrman, White & McAuliffe, San Francisco, CA, Mark S. Stewart, Edward D. Rogers, Bal-

lard, Spahr, Andrews and Ingersoll, Philadelphia, PA, Peter J. Crosby, IV, Heller, Ehrman, White & McAuliffe, San Francisco, CA, Edward C. Fitzpatrick, Lord, Bissell & Brook, Chicago, IL, Gregory Thomas Casamento, Lord, Bissell & Brook, LLP (NYC), New York City, Michael T. Scott, Reed, Smith, Shawe and McClay, Philadelphia, PA, Randall A. Hack, Lord, Bissell & Brook, Chicago, IL, Richard Cashman, Heller, Ehrman, White & McAuliffe LLP, New York, Robert P. Mahnke, Heller, Ehrman, White & McAuliffe, San Francisco, CA, Adam P. Strochak, Bruce A. Colbath, Denise L. Kosineski, Jay N. Fastow, Weil, Gotshal & Manges, New York, David H. Marion, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Mark A. Aronchick, Hangley, Aronchick, Segal and Pudlin, Philadelphia, PA, Thomas D. Nevins, Sheppard, Mullin, Richter & Hampton, L.L.P., San Francisco, CA, David F. Graham, John W. Treece, John Kenneth Van de Weert, Mark Bruce Blocker, Theodore R. Scarborough, Jr., Sidley, Austin, Brown & Wood, Chicago, IL, John J. Kuster, Sidley, Austin, Brown & Wood, New York City, Michael D. Epstein, Montgomery, McCracken, Walker & Rhoads, Philadelphia, PA, Andrew J. Soven, Reed, Smith, Shaw & McClay L.L.P., Philadelphia, PA, Jonathan Young, Reed, Smith, L.L.P., New York City, Mark P. Ladner, Morrison & Foerster, L.L.P., New York City, Robert A. Nicholas, Reed, Smith, Shaw & McClay L.L.P., Philadelphia, PA, Charles E. Buffon, Joshua D. Wolson, Covington & Burling, Washington, D.C., Michael C. Nicholson, Covington & Burling, New York City, Peter E. Greene, Skadden, Arps, Slate, Meagher & Flom, L.L.P., New York City, Stephen P. Chawaga, Montevede, McAlee & Hurd, Philadelphia, PA, Alexander Geiger, Geiger and Rothenberg, LLP, New York City, George A., Kent M. Of Firm Morgan, Lewis & Bockius, LLP, Jr., Morgan, Lewis & Bockius, LLP, San Francisco, CA, Harry T. Of Firm Morgan, Lewis & Bockius, LLP, Morgan, Lewis & Bockius, LLP, New York City, Christopher Robin Lipsett, Wilmer, Cutler & Pickering, New York City, Noah Levine, Wilmer, Cutler, Pickering, Hale & Dorr LLP, New York City, for defendants.

## MEMORANDUM AND ORDER

PAULEY, District Judge.

This consolidated class action, alleging violations of the Sherman Act, 15 U.S.C. § 1 *et seq.*, the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq.*, and the South Dakota Deceptive Trade Practices Act ("DTPA"), arises out of an alleged price-fixing conspiracy by and among Visa and MasterCard and their member banks (collectively "Defendants") with respect to currency conversion fees. Presently before this Court is Plaintiffs' motion to certify three distinct classes in their pending actions. For the reasons set forth below, Plaintiffs' motion is granted in part and denied in part.

## BACKGROUND

The factual background underlying this action is set forth in this Court's prior Memorandum and Order. *See In re Currency Conversion Fee Antitrust Litig.*, 265 F.Supp.2d 385 (S.D.N.Y.2003). The facts relevant to this motion are repeated here.

VISA and MasterCard enable cardholders from the United States to purchase goods or services in a foreign country in that nation's currency. The amount is converted to U.S. dollars and then billed to the United States cardholder. The prevailing conversion rate for the applicable foreign currency is applied to the cardholder's transaction. *Currency Conversion*, 265 F.Supp.2d at 393.

As part of the conversion, cardholders are charged a currency conversion fee that ranges between one and three percent of the total cost of the purchase. *Currency Conversion*, 265 F.Supp.2d at 393. Plaintiffs claim that Defendants imposed upon their cardholders artificially inflated foreign currency conversion fees, without informing the cardholders. (Plaintiffs' Memorandum in Support of Class Certification ("Pl.Mem.") at 2–3.) Plaintiffs allege that these fees are assessed regardless of whether Defendants convert or exchange the currency. VISA and MasterCard automatically impose this currency conversion fee on cardholders at the network level. *Currency Conversion*, 265 F.Supp.2d at 393.

There are two tranches of currency conversion fees charged by VISA and MasterCard. The first is charged by either VISA or MasterCard at one percent of the purchase price and retained by the respective association. The second tier, typically two percent on top of the one percent fee, is retained by the cardholder's issuing bank. *Currency Conversion,* 265 F.Supp.2d at 393–94.

Plaintiffs move to certify three classes: (a) a damages class, (b) an antitrust injunctive relief class, and (c) a TILA class. The damages class would comprise: "all VISA, MasterCard and Diners Club general purpose cardholders who used cards issued by any of the issuing bank defendants during the Damages Period, and were assessed a currency conversion fee or currency conversion surcharge for using such cards to purchase goods and/or services denominated in a foreign currency." (Second Consolidated Amended Class Action Complaint ("Compl.") ¶ 139; Pl. Mem. at 9.) Because Counts II, III and V of the Complaint each allege injuries suffered only by a segment of the damages class, Plaintiffs seek to divide the damages class into three subclasses:

a) All cardholders of MasterCard-branded general purpose cards issued by any of the issuing bank defendants who were assessed a foreign transaction fee or surcharge for using such cards to purchase goods and/or services in foreign currencies ("MasterCard Subclass").

b) All cardholders of Visa-branded general purpose cards issued by any of the issuing bank defendants who were assessed a foreign transaction fee or surcharge for using such cards to purchase goods and/or services in foreign currencies ("Visa Subclass").

c) All cardholders of general purpose cards issued by Citibank (South Dakota) who were assessed a foreign transaction fee or surcharge for using such cards to purchase goods and/or services in foreign currencies ("Citibank Subclass").

(Pl. Mem. at 10.)

Plaintiffs allege that Defendants continue to improperly assess currency conversion fees. (Pl. Mem. at 10.) Accordingly, Plaintiffs seek to certify a separate "Antitrust Injunctive Relief Class" comprising "all VISA, MasterCard and Diners Club general purpose cardholders of the issuing bank defendants." (Compl. ¶ 140; Pl. Mem. at 10.)

Finally, Plaintiffs seek certification of a "TILA class" comprising "VISA, MasterCard and Diners Club general purpose cardholders with cards issued by any of the defendants." (Compl. ¶ 141; Pl. Mem. at 10.) The TILA class would comprise all cardholders—not just those who paid conversion fees. Plaintiffs propose to centrifuge the TILA class into seven subclasses[1], one for each issuing bank.

Defendants oppose Plaintiffs' motion for class certification, arguing that individual questions of impact, injury and damages would overwhelm any common questions; that class certification is not the superior method of adjudication; and that Plaintiffs fail to satisfy the adequacy requirement. Defendants further argue that class certification under Rule 23(b)(2) is inappropriate since Plaintiffs' predominant claim is for monetary damages. In addition, Defendants argue that should this Court certify any class, all cardholders having an arbitration agreement with their card issuer should be excluded from the class definitions.

## DISCUSSION

### I. *Class Certification Standards*

■ Rule 23 of the Federal Rules of Civil Procedure governs class certification. *Parker v. Time Warner Entm't Co., L.P.,* 331 F.3d 13, 18 (2d Cir.2003); *accord Benner v. Becton Dickinson & Co.,* 214 F.R.D. 157, 162 (S.D.N.Y.2003). The Supreme Court has instructed that a district court must conduct a "rigorous analysis" to ascertain whether Rule

---

1. By a Memorandum and Order dated July 3, 2003, this Court stayed plaintiff Ruga's claims against First USA Bank, N.A. and plaintiff Ross' claims against Bank of America, N.A. (USA). *See*

*Currency Conversion,* 265 F.Supp.2d at 416. Therefore, plaintiffs do not seek certification of the First USA Bank and the Bank of America subclasses. (Pl. Mem. at 10 n. 9.)

23 requirements have been satisfied. *See Gen. Tel. Co. v. Falcon*, 457 U.S. 147, 161, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982); *accord Caridad v. Metro–North Commuter R.R.*, 191 F.3d 283, 291 (2d Cir.1999). While Rule 23 must be liberally interpreted and not given a strict construction, *Marisol A. v. Giuliani*, 126 F.3d 372, 377 (2d Cir.1997), the party seeking class certification bears the burden of establishing the requisites of Rule 23, *see Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997); *Caridad*, 191 F.3d at 291.

There are two prerequisites for class actions. First, the party seeking class certification must prove that the proposed class meets the four requirements of Rule 23(a): (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a); *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 132–33 (2d Cir. 2001). Second, the party seeking class certification must show that the proposed class action falls within one of the types of class actions maintainable under Rule 23(b) because: (1) prosecution of separate actions by individual parties would create a risk of either inconsistent adjudications or would be dispositive of the interest of those members not parties to the adjudication; (2) defendants have acted or refused to act on grounds generally applicable to the class; or (3) questions of law or fact common to members of the class predominate, and a class action is superior to other available methods for adjudication. Fed.R.Civ.P. 23(b); *Visa*, 280 F.3d at 133.

▇▇ When considering a motion for class certification, courts should consider the allegations in the complaint as true. *Shelter Realty Corp. v. Allied Maint. Corp.*, 574 F.2d 656, 661 n. 15 (2d Cir.1978). However, a court may consider material outside the pleadings in determining the appropriateness of class certification. *Kaczmarek v. Int'l Bus. Mach. Corp.*, 186 F.R.D. 307, 311

(S.D.N.Y.1999) (citing *Sirota v. Solitron Devices, Inc.*, 673 F.2d 566, 571 (2d Cir.1982)); *see also Fox v. Cheminova, Inc.*, 213 F.R.D. 113, 121–22 (E.D.N.Y.2003). Nonetheless, its resolution of a class certification motion may not become "a preliminary inquiry into the merits" of the case. *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Visa*, 280 F.3d at 133. "In determining the propriety of a class action, the question is not whether the plaintiff or plaintiffs have stated a cause of action or will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Eisen*, 417 U.S. at 178, 94 S.Ct. 2140 (internal quotation marks omitted).

## II. *Rule 23(a) Requirements*

### A. *Numerosity*

Plaintiffs must show that the proposed class "is so numerous that joinder of all members is impracticable." Fed.R.Civ.P. 23(a)(1). "Impracticable" simply means difficult or inconvenient, not impossible. *See Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993); *Reynolds et al. v. Giuliani*, 118 F.Supp.2d 352, 388 (S.D.N.Y.2000). Further, plaintiffs do not need to provide a precise number for the class size. *See Robidoux*, 987 F.2d at 935; *In re Laser Arms Corp. Sec. Litig.*, 794 F.Supp. 475, 494 (S.D.N.Y. 1989) ("Since the numerosity requirement speaks in terms of impracticability rather than impossibility, plaintiffs need not enumerate the precise number of potential plaintiffs in the class when reasonable estimates will suffice.").

▇▇ Here, Plaintiffs contend that "members of the Classes are so numerous and geographically dispersed that joinder of all class members in this action is impracticable." (Compl.¶ 142.) Indeed, they allege that "each of the proposed classes encompasses a million or more members." (Pl. Mem. at 17.) These allegations satisfy the numerosity requirement. *See, e.g., Marisol A.*, 126 F.3d at 376 (class of "over 100,000 children" "obviously numerous"); *Cons. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir.1995) ("numerosity is presumed at a level of 40 members"); *Morel v. Giulia-*

*ni,* 927 F.Supp. 622, 633 (S.D.N.Y.1995) (a class of 24,000 members satisfies numerosity).

### B. *Commonality and Typicality*

"The commonality and typicality requirements tend to merge into one another, so that similar considerations animate analysis of Rules 23(a)(2) and (3)." *Marisol A.,* 126 F.3d at 376. The crux of both requirements is to ensure that "maintenance of a class action is economical and [that] the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence." *Gen. Tel.,* 457 U.S. at 157 n. 13, 102 S.Ct. 2364.

The commonality requirement is met if the plaintiffs' claims share a common question of law or fact. *See Marisol A.,* 126 F.3d at 376; *In re Agent Orange Prod. Liab. Litig.,* 818 F.2d 145, 166–67 (2d Cir.1987). The "typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability[,] . . . irrespective of minor variations in the fact patterns underlying the individual claims." · *Robidoux,* 987 F.2d at 936–37. Further, the commonality requirement does not require that each class member have identical claims as long as at least one common question of fact or law is evident. Factual differences in the class claims do not automatically preclude a finding of commonality. *See Marisol,* 126 F.3d at 377; *Fox,* 213 F.R.D. at 125–26.

Defendants argue that each class member's claim involves unique individual facts, which defeats commonality and typicality. (Defendants' Memorandum in Opposition of Class Certification ("Def.Mem.") at 28 n.8, 31.)[2] They contend that Plaintiffs have failed to show that there are common factual issues as to proof of injury or impact. (Def. Mem. at 30–31.) Defendants' arguments are without merit, because slight variations in the fact patterns of individual Plaintiffs do

not vitiate commonality and typicality. *See Robidoux,* 987 F.2d at 937.

Plaintiffs have alleged a number of questions of law and fact that are common and typical to the three proposed classes, including, *inter alia:* (a) whether Defendants engaged in a conspiracy to fix the conversion fees levied on their cardholders, (b) whether Defendants took affirmative steps to conceal their conspiracy, (c) whether Defendants' actions violated Section 1 of the Sherman Act, (d) whether Defendants' conspiracy further involved concealment of the conversion fees, (e) whether Defendants' continued imposition of the conversion fees needs to be enjoined, (f) whether Defendants failed to comply with TILA by not disclosing the first tier of the conversion fees, (g) whether Defendants failed to comply with TILA by not disclosing the second tier of the conversion fees, and (h) the mechanism used to accomplish the objectives of the conspiracy. (Compl.¶¶ 145, 146, 148.) These common questions are sufficient to meet the commonality and typicality requirements. *See, e.g., In re Buspirone Patent Litig.,* 210 F.R.D. 43, 57 (S.D.N.Y.2002). Indeed, allegations concerning the existence, scope and efficacy of an alleged antitrust conspiracy are sufficient to show that the commonality and typicality requirements of Rule 23(a)(2) are met. *See In re NASDAQ Market–Makers Antitrust Litig.,* 169 F.R.D. 493, 509–12 (S.D.N.Y.1996).

### C. *Adequacy*

Adequate representation requires that class counsel be qualified, experienced and generally able to conduct the litigation, and the interests of the named plaintiffs be congruent to those of the absentee class members. *See Amchem Prods.,* 521 U.S. at 625–26, 117 S.Ct. 2231; *Gen. Tel.,* 457 U.S. at 157–58, 102 S.Ct. 2364; *Marisol A.,* 126 F.3d at 378.

Defendants argue that Plaintiffs have failed to satisfy the adequacy requirement because Plaintiffs' counsel cannot fairly and adequately protect the interests of the putative class members due to their involve-

---

**2.** Plaintiffs' allegations against Defendant Citibank (South Dakota), N.A., for violation of the DTPA are addressed below, in Section IV.

ment in *Schwartz v. Visa Int'l Corp.*, No. 822404–4, 2003 WL 1870370 (Cal. Sup.Ct. Alameda Cty.), a related action in California state court, which creates a conflict of interest. (Def. Mem. at 48–51.) Defendants argue that a final resolution in the *Schwartz* case may involve "restitution" to the *Schwartz* class members, which would bar them from receiving treble damages in this action. (Def. Mem. at 49–50.) Defendants contend that Plaintiffs' counsel have failed to provide adequate notice to the *Schwartz* plaintiffs regarding this potential bar to recovery, creating a conflict of interest between the named Plaintiffs and the *Schwartz* class members. (Def. Mem. at 50–51.) Even if Plaintiffs' counsel's failure to provide sufficient notice to the *Schwartz* plaintiffs was imprudent, such an omission does not create a conflict. The *Schwartz* plaintiffs would face the same bar regardless of who the Plaintiffs' counsel are.

Defendants also assert that Plaintiffs have failed to enter "into fee agreements with their counsel agreeing to cover their *pro rata* share of the costs of the litigation, as required by ... Disciplinary Rule 5–103(B)." (Def. Mem. at 52.) Plaintiffs acknowledge that they bear ultimate responsibility for the litigation costs their counsel are advancing. (Declaration of David A. Langer, dated Apr. 2, 2004 ("Langer Decl.") Exs. 16, 17: deposition transcripts of Plaintiffs Stanley B. Balbach, Jr. and Robert R. Ross). This Court is satisfied that Plaintiffs have affirmed their responsibility to pay litigation costs. *See Krueger v. New York Tel. Co.*, 163 F.R.D. 433, 443 n. 6 (S.D.N.Y.1995) ("While the ability of a class representative to defray the cost of litigation is a relevant factor in the court's determination of the representative's suitability, it is sufficient that plaintiffs state they are willing to pay their share.") (internal quotation marks, citations and brackets omitted). Moreover, the DR 5–103 strictures do not trump the strong federal interest in efficient prosecution of antitrust and TILA claims. *See, e.g., In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 284 (S.D.N.Y.2003) (noting that "strong federal interests [in the private prosecution of securities fraud claims] require[d] that the repayment of ex-

penses provision in DR 5–103 be disregarded").

Further, Plaintiffs' counsel's success in the *Schwartz* case is evidence of their qualifications. Indeed, Defendants do not dispute that Plaintiffs' counsel have "years of experience, including trial experience, with the currency conversion practices of the Defendants and ... [have] intimate familiarity with the evidence and legal and factual issues." (Pl. Reply Mem. at 36.) Accordingly, this Court finds that Plaintiffs' counsel will adequately and vigorously represent the interests of Plaintiffs in this action.

## III. *Rule 23(b) Requirements*

### A. *Rule 23(b)(3)*

Plaintiffs seek certification of their damages class pursuant to Rule 23(b)(3), which states that a class action is appropriate when:

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3). A district court is required to take a close look at a putative class under Rule 23(b)(3). *Amchem*, 521 U.S. at 615–16, 117 S.Ct. 2231. In assessing whether to certify the class, a court should consider:

> (A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action.

Fed.R.Civ.P. 23(b)(3).

#### i. *Predominance*

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by

representation." *Amchem*, 521 U.S. at 623, 117 S.Ct. 2231; *Visa*, 280 F.3d at 136. "In order to meet the predominance requirement of Rule 23(b)(3), a plaintiff must establish that 'the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, ... predominate over those issues that are subject only to individualized proof.'" *Visa*, 280 F.3d at 136 (quoting *Rutstein v. Avis Rent–A–Car Sys., Inc.*, 211 F.3d 1228, 1233 (11th Cir. 2000)). Indeed, "[t]he predominance requirement calls only for predominance, not exclusivity, of common questions." *Shelter Realty Corp. v. Allied Maint. Corp.*, 75 F.R.D. 34, 37 (S.D.N.Y.1977). Further, the predominance requirement is generally satisfied "unless it is clear that individual issues will overwhelm the common questions." *NASDAQ*, 169 F.R.D. at 517.

To recover damages under Section 1 of the Sherman Act, Plaintiffs must prove "(1) that defendants violated the antitrust laws; (2) that the alleged violations caused plaintiffs to suffer some direct antitrust injury to their business or property; and (3) that the extent of this injury can be quantified with requisite precision." *NASDAQ*, 169 F.R.D. at 517 (internal brackets omitted); *see also Visa*, 280 F.3d at 136–40. Predominance is a test readily met in cases alleging violations of antitrust laws. *Amchem*, 521 U.S. at 625, 117 S.Ct. 2231; *see Jennings Oil Co. v. Mobil Oil Corp.*, 80 F.R.D. 124, 130 (S.D.N.Y.1978) ("Where an antitrust conspiracy has been at issue, courts have tended to find that common questions predominated despite the existence of individual questions."). Indeed, such is the case here.

### a. *Violation of Antitrust Laws*

█ The focal point of this action is Defendants' alleged price-fixing conspiracy to assess artificially inflated conversion fees without informing their cardholders. (Compl. ¶ 1; Pl. Mem. at 2–3.) It is well-settled that "the existence of a conspiracy is the predominant issue in price fixing cases, warranting certification of the class even where significant individual issues are present." *NASDAQ*, 169 F.R.D. at 518; *see Bus-*

*pirone*, 210 F.R.D. at 58; *Jennings Oil*, 80 F.R.D. at 130.

Plaintiffs allege: (1) Defendants conspired to establish and maintain minimum conversion fees (Compl.¶¶ 153–54); (2) Defendants colluded to conceal the existence of the conversion fees (Compl.¶¶ 128–29); and (3) the conversion fees were set at supracompetitive levels (Compl.¶¶ 112, 156, 164, 172). To prove their allegations, Plaintiffs must show that Defendants conspired to fix the conversion fees in violation of Section One of the Sherman Act, which would require common proof.

### b. *Antitrust Injury*

Defendants contend that Plaintiffs have not offered any methodology or evidence for determining antitrust injury on a common basis and, thus, failed to meet the predominance standard. (Def. Mem. at 30.) Defendants argue that Plaintiffs have "the burden of showing, on a class-wide basis, with the same evidence that proves their own individual injury: (1) what the price of currency conversion services would have been at the time of each individual purchase in foreign currency but for the alleged violations; and (2) that, for each transaction, every cardholder paid a higher price, also taking into account the total benefits received by that cardholder." (Def. Mem. at 31.) Arguing that "credit cards are not homogeneous products," Defendants assert that any trial would be unmanageable because it would necessitate "a network-by-network, issuer-by-issuer, portfolio-by-portfolio, and cardholder-by-cardholder inquiry resulting in predominating individual issues that will overwhelm any common proof." (Def. Mem. at 31–33.) Finally, Defendants maintain that Plaintiffs cannot proffer common proof of antitrust impact because they failed to examine how the "but-for" price of currency conversion would affect interrelated credit card charges and services. (Def. Mem. at 35.)

According to Defendants, because consumers carry credit cards with different terms and features, Plaintiffs cannot show common impact of the alleged antitrust injury. Defendants' arguments lack merit. In another antitrust litigation involving the same credit

card networks, the Second Circuit approved certification of a class. *See, e.g., Visa,* 280 F.3d at 136–40. In *Visa,* the plaintiff class consisting of "a number of large and small merchants and three trade associations," alleged that an "honor all cards" policy requiring acceptance of Visa and MasterCard debit cards was a Sherman Act violation. 280 F.3d at 129–30. Yet, the court held that common questions predominated. *Visa,* 280 F.3d at 136–38.

The sole test for this Court is "whether the common issues will predominate over the individual questions," not whether individual questions exist. *Visa,* 280 F.3d at 138. At this stage, Plaintiffs need only advance a plausible methodology to demonstrate that antitrust injury can be proven on a class-wide basis. *Visa,* 280 F.3d at 135; *see also In re Nine West Shoes Antitrust Litig.,* 80 F.Supp.2d 181, 189–90 (S.D.N.Y.2000) (noting that where plaintiffs pay higher prices than if there was no conspiracy, antitrust injury will lie). Plaintiffs propose a methodology to show that antitrust injury can be proven on a common basis. (Joint Declaration of Gustavo E. Bamberger and Bradley M. Reiff, dated Nov. 11, 2003 ("Jt.Decl.") ¶¶ 24–25.) They posit:

> In the conspiracies described by [P]laintiffs, Visa, MasterCard and the defendant issuing banks agree[d] to set a floor of one percent on a fee for the use of U.S. cardholders' general-purpose credit cards to purchase goods or services denominated in foreign currencies. Thus, the conspiracies have a common impact on each member of the Damages Class, the VISA Subclass and the MasterCard Subclass. In particular, each class member paid a conspiratorially set fee of at least one percent for the use of a general-purpose card issued by a defendant bank to purchase goods or services denominated in foreign currencies.

(Jt.Decl.¶ 24.)

While Defendants take issue with Plaintiffs' methodology, this Court need not evaluate whether Plaintiffs' theories are likely to prevail at trial. Instead, the inquiry is limited to whether the proposed methodology is susceptible to common proof. *See Visa,* 280 F.3d at 135. Plaintiffs' proposed methodology entails showing that every cardholder who paid the conspiratorially-set conversion fee was automatically injured in making that payment. Accordingly, this Court finds that the Plaintiffs' proposed methodology for determining antitrust injury would rely on evidence common to the entire class.

### c. *Damages*

Defendants also oppose class certification because there is "no common methodology as to how damages will be calculated." (Def. Mem. at 40.) They contend that Plaintiffs' damages formula requires separate fact specific inquiries and numerous judicial determinations. (Def. Mem. at 40, 42.) Finally, Defendants argue that Plaintiffs' failure to provide a plausible damages formula cannot be saved by bifurcation. (Def. Mem. at 43.)

Plaintiffs' experts posit a methodology for measuring damages on a class-wide basis. (Jt.Decl.¶¶ 26–35.) Regarding the first tier fee, they opine that "[d]amages from the conspiratorial implementation of a one percent fee could be calculated for a whole class, and the damages for each member of the Damages Class, the VISA Subclass and the MasterCard Subclass could be determined formulaically." (Jt.Decl.¶ 31.) Expanding on their thesis, they assert that "aggregate damages could be calculated by subtracting the [hypothetical] but-for [3] level of network fees paid by all class members from the actual amount of network fees," and individual damages could be determined formulaically. (Jt.Decl.¶¶ 31–32.) As for the second tier fee, Plaintiffs' experts propose that "aggregate damages [would] equal the actual additional fees paid by class members minus the but-for fee times the dollar value of transactions to which the fee was applied." Then, "individual damages for each [class] member . . . [would] equal the actual additional fees paid by a class member minus the but-for fee times the dollar value of transac-

---

**3.** Plaintiffs' experts suggest that in a "but-for world," the conversion fees would be closer to the marginal costs, which, in turn, would be "close to zero." (Jt.Decl.¶ 29.) Thus, the marginal fees would be susceptible to common proof.

tions to which the fee was applied." (Jt.Decl.¶¶ 34–35.)

In considering certification, the inquiry focuses not on validity of the proposed methods for proving damages on a class-wide basis, but on the availability of those methods. *In re Vitamins Antitrust Litig.*, 209 F.R.D. 251, 268 (D.D.C.2002). Plaintiffs have offered a viable methodology for calculating damages on a class-wide basis, which are not "so insubstantial and illusive as to amount to no method at all." *Vitamins*, 209 F.R.D. at 268 (internal quotations omitted).

■ Moreover, individual damage issues cannot defeat certification where common issues predominate with respect to the alleged antitrust conspiracy and impact. *Visa*, 280 F.3d at 139 ("Common issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues."); *NASDAQ*, 169 F.R.D. at 523 ("Neither a variety of prices nor negotiated prices is an impediment to class certification if it appears that plaintiffs may be able to prove at trial that, as here, the price range was generally affected."). "Even if it could be shown that some individual class members were not injured, class certification, nevertheless, is appropriate where the antitrust violation has caused widespread injury to the class." *NASDAQ*, 169 F.R.D. at 523. Since common issues concerning antitrust conspiracy and injury predominate, individual damage issues do not defeat certification.

### ii. *Superiority*

■ Rule 23(b)(3) also requires "that a class action [be] superior to other available methods for the fair and efficient adjudication of the controversy." Courts are instructed to consider four nonexclusive factors in determining whether the class action is a superior device. These factors are: (1) the class members' interests in litigating individually in separate actions; (2) the extent and nature of any related litigation already commenced by class members; (3) the desirability of concentrating litigation of the claims in

a particular forum; and (4) the manageability of the litigation as a class action. Fed R. Civ. P. 23(b)(3); *Amchem Prods.*, 521 U.S. at 615–16, 117 S.Ct. 2231.

Here, the enormous size of the proposed classes makes class action the superior method for the fair and efficient adjudication of the controversy. *Hirschfeld v. Stone*, 193 F.R.D. 175, 184 (S.D.N.Y.2000); *NASDAQ*, 169 F.R.D. at 527. Moreover, no individual may have recoverable damages in an amount that would induce him to commence litigation on his own behalf. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (noting that "class actions . . . permit the plaintiffs to pool claims which would be uneconomical to litigate individually," especially where the low amount of damages makes it such that "most of the plaintiffs would have no realistic day in court if a class action were not available"); *NASDAQ*, 169 F.R.D. at 527. Under such circumstances, a class action is efficient and serves the interest of justice. *Bolanos v. Norwegian Cruise Lines Ltd.*, 212 F.R.D. 144, 158 (S.D.N.Y.2002). Accordingly, this Court finds that the proposed class action is a superior vehicle for adjudicating Plaintiffs' claims.

### B. *Rule 23(b)(2)*

Defendants oppose a Rule 23(b)(2) class with essentially the same arguments that they advanced on commonality and predominance issues.[4] (Def. Mem. at 45.) Adding to that mix, Defendants contend that a Rule 23(b)(2) class may not be certified where the appropriate final relief is predominantly for money damages. (Def. Mem. at 46.)

■ Certification under Rule 23(b)(2) is permissible when a defendant's conduct is generally applicable to the entire class, making final injunctive or declaratory relief appropriate. Fed.R.Civ.P. 23(b)(2); *see also NASDAQ*, 169 F.R.D. at 516 ("Certification is appropriate under Rule 23(b)(2) where declaratory or injunctive relief is an important aspect of the overall relief sought."). How-

---

4. Defendants do not argue against certifying an injunctive relief class based on Plaintiffs' TILA claims. Accordingly, only certification of the injunctive relief class based on the antitrust claims is discussed.

ever, certification is warranted where "the appropriate final relief relates exclusively or predominantly to money damages." Fed. R.Civ.P. 23(b)(2) advisory committee's note to 1966 Amendments. A class under Rule 23(b)(2) may be certified where the final relief includes money damages:

> [W]hen presented with a motion for (b)(2) class certification of a claim seeking both injunctive relief and non-incidental monetary damages, ... [t]he district court may allow (b)(2) certification if it finds in its informed, sound judicial discretion that (1) the positive weight or value to the plaintiffs of the injunctive or declaratory relief sought is predominant even though compensatory or punitive damages are also claimed, and (2) class treatment would be efficient and manageable, thereby achieving an appreciable measure of judicial economy.

*Robinson v. Metro–North Commuter R.R. Co.*, 267 F.3d 147, 164 (2d Cir.2001) (internal citations omitted).

Injunctive relief is appropriate where it "would be both reasonably necessary and appropriate were the [P]laintiffs to succeed on the merits." *Robinson*, 267 F.3d at 164. Here, Plaintiffs seek relief that "the [D]efendants be enjoined from continuing the illegal course of conduct alleged ... [and] be required to prominently disclose any and all currency conversion fees in each of their solicitations, applications, promotional materials, disclosure statements, monthly statements and agreements with cardholders." (Compl. at 45.) If Plaintiffs succeed on the merits, equitable relief will.be appropriate to enjoin the unlawful conduct. Accordingly, Plaintiffs' request for certification of an injunctive relief class is granted. *See Visa*, 280 F.3d at 146–47.

## IV. South Dakota Deceptive Trade Practices Act

■ Count V of the Complaint alleges that Citibank violated the DTPA. Plaintiffs allege that Citibank knowingly and intentionally engaged in deceptive acts by failing to disclose the existence of the second tier conversion fees in solicitations to prospective cardholders and monthly statements to cardholders. (Compl.¶¶ 182–83.) Specifically, Plaintiffs allege that Citibank's "monthly statements do not disclose the actual base currency conversion rate and the additional first tier and second tier currency conversion fees are not separately itemized." (Compl.¶ 184.) As a result, Plaintiffs claim that Citibank's "deceptive acts and/or practices" violated the DTPA and that Plaintiffs "suffered monetary injury." (Compl.¶¶ 185–86.)

Citibank opposes class certification on the DTPA claim on standing and typicality grounds. (Citibank's Memorandum in Opposition of Class Certification ("Citibank Mem.") at 2–3.) Citibank further argues that class certification is improper because individual issues of reliance, causation and injury would predominate. (Citibank Mem. at 7–10.)

### A. Applicable Law

The DTPA provides: "Any person who claims to have been adversely affected by any act or a practice declared to be unlawful by [S.D. Codified Law] § 37–24–6 shall be permitted to bring a civil action for the recovery of actual damages suffered as a result of such act or practice." S.D. Codified Law § 37–24–31. More specifically, Section 37–24–6 explains: "It is a deceptive act or practice for any person to ... [k]nowingly and intentionally act, use, or employ any deceptive act or practice, fraud, false pretense, false promises, or misrepresentation or to conceal, suppress, or omit any material fact in connection with the sale ... of any merchandise, regardless of whether any person has in fact been mislead, deceived, or damaged thereby." S.D. Codified Law § 37–24–6(1).

Thus, a plaintiff must prove the following elements: (1) a knowing and intentional deceptive act by defendant; (2) that the deceptive act occurred in connection with a sale; (3) an injury to plaintiff; and (4) causation. *See Brookings Mun. Utils., Inc. v. Amoco Chem. Co.*, 103 F.Supp.2d 1169, 1177–78 (D.S.D.2000) ("[P]laintiffs' cause[ ] of action for ... deceptive trade practices ... require[s] proof of an intentional misrepresentation or concealment of fact on which plain-

tiffs relied and which caused an injury to them."). Thus, Plaintiffs must show that Citibank deceptively withheld information regarding its conversion fees for purchases in foreign currencies, causing Plaintiffs to suffer damages.[5]

## B. *Predominance*

Citibank contends that individual issues regarding causation and actual injury overwhelm the common issues, and preclude a finding of predominance. (Citibank Mem. at 10–11.) Plaintiffs counter that causation is a merits issue that is irrelevant to class certification. (Pl. Mem. at 43 (citing *Fox*, 213 F.R.D. at 129).)

To show predominance, a plaintiff must establish that issues subject to generalized proof predominate over those subject to individualized evidence. *See Visa*, 280 F.3d at 136. Because a court must consider the elements of a claim and determine whether they can be satisfied by common class-wide proof, Plaintiffs' notion that the causation inquiry does not bear on class certification is without merit. *See In re Linerboard Antitrust Litig.*, 305 F.3d 145, 156 (3d Cir.2002) ("Clearly, if proof of the essential elements of the cause of action require individual treatment, then there cannot be a predominance of questions of law and fact common to the members of the class.") (internal quotations omitted); *WorldCom*, 219 F.R.D. at 287.

To prevail on their DTPA claims, each Plaintiff will need to prove that Citibank caused his injury. *See Brookings*, 103 F.Supp.2d at 1177–78 (noting that the DTPA requires "proof of an intentional misrepresentation or concealment of fact on which plaintiffs relied and which caused an injury to them"); *see also Petitt v. Celebrity Cruises, Inc.*, 153 F.Supp.2d 240, 266 (S.D.N.Y. 2001) (causation requires showing that defendant's materially deceptive act caused plaintiff's injury). Plaintiffs argue that the DTPA does not require a separate individualized

showing of reliance. (Pl. Mem. at 39–41.) Even if Plaintiffs are correct that reliance is not a separate element of the DTPA, proving causation requires that the alleged injury resulted from reliance on Citibank's omission or misrepresentation. *Hageman v. Twin City Chrysler–Plymouth Inc.*, 681 F.Supp. 303, 308 (M.D.N.C.1988) ("To prove actual causation, a plaintiff must prove that he or she detrimentally relied on the defendant's deceptive statement or misrepresentation. Stated differently, the deceptive act or practice must have actually mislead or deceived the plaintiff.") (citations omitted); *Brookings*, 103 F.Supp.2d at 1177–78.

Assessment of specific causation often dissolves into a "myriad of individualized causation inquiries." *In re Rezulin Prods. Liab. Litig.*, 210 F.R.D. 61, 66 (S.D.N.Y.2002). Here, the "individualized causation" is obvious since different class members used their Citibank cards with different understandings of their cardmember agreements. There is no dispute that the cardholder agreement expressly provides for both first tier and second tier conversion fees. (Declaration of Susan Bridge, dated Feb. 18, 2004 ("Bridge Decl.") Ex. 1: Cardmember Agreement.) Thus, to prove causation, each Plaintiff must show that Citibank's disclosure of the conversion fees was inadequate, causing the cardholder to be deceived into using the Citibank card for foreign purchases when other more economical options were available. *See Pelman v. McDonald's Corp.*, No. 02 Civ. 7821(RWS), 2003 WL 22052778, at *10–11 (S.D.N.Y. Sept.3, 2003) (noting that plaintiff must show a connection between the allegedly deceptive practice and her injuries).

Causation requires proof that the cardmember agreement gave insufficient notice regarding the conversion fees. That showing entails individual inquiries, and an examination of each cardholder's understanding and whether it was justified.[6] *Moore v. Paine-*

---

**5.** Without citation to any relevant authority, Citibank argues that the DTPA does not apply to credit cards. This contention, is without merit. *See South Dakota v. W. Capital Corp.*, 290 N.W.2d 467, 471 (S.D.1980) (DTPA includes extension of credit in "services"); *see also Demry v. Citibank*

*(S.D.), N.A.*, No. 01 Civ. 9959(HB), 2003 WL 179772, at *5 (S.D.N.Y. Jan.24, 2003) (same).

**6.** As opposed to the antitrust claims where Defendants' alleged conspiratorial actions predominated over individual inquiries, the DTPA causa-

---

*Webber, Inc.,* 306 F.3d 1247, 1255–56 (2d Cir.2002) (class certification of fraud claims not appropriate where misrepresentations cannot be demonstrated using generalized proof rather than individualized proof).

While there may be some common questions concerning Citibank's behavior with respect to its assessment of the conversion fees, individual questions concerning causation overwhelm those common issues.[7] Accordingly, this Court finds that Plaintiffs' DTPA claim is not appropriate for class certification.

## V. Arbitration Clauses

Defendant banks contend that most putative class members voluntarily signed a binding arbitration agreement with their credit card issuers, precluding them from bringing this action. (Def. Mem. at 53–55, 58–59; Defendants' Supplemental Memorandum on Arbitration Issue ("Def.Arb.Mem.") at 1–2, 8.)

■ It is undisputed, however, that some defendant banks added arbitration clauses to their cardholder agreements after this putative class action was filed. (Def. Mem. at 63–64 (acknowledging that Chase, Citibank, Diners Club and Providian[8] added arbitration clauses to their cardholder agreements after commencement of this litigation).) Thus, the preliminary question is whether cardholders who accepted arbitration clauses after this litigation commenced are precluded from participation in the class. This Court holds that they are not.

A court may exercise supervisory authority over a defendant's communications with putative class members. *See* Fed.R.Civ.P. 23(d). This is particularly apt where a defendant attempts to alter the contours of the litigation or the availability of remedies. *See Phillips Petroleum,* 472 U.S. at 810–12, 105 S.Ct. 2965 (requiring notice be given to absent class members regarding the civil action and the plaintiffs' rights in the action); *Gulf Oil v. Bernard,* 452 U.S. 89, 99–100, 101 S.Ct. 2193, 68 L.Ed.2d 693 (1981) (noting that Rule 23 allows a court to restrict communications between a party and members of a class or putative class).

Defendants Chase, Citibank, Diners Club and Providian required cardholders to agree to arbitration without this Court's knowledge or permission. When a defendant contacts putative class members solely for the purpose of altering the status of the pending litigation, such communication is improper without judicial authorization. *See Hampton Hardware, Inc. v. Cotter & Co., Inc.,* 156 F.R.D. 630, 632 (N.D.Tex.1994) (noting that defendant's communications affecting a class member's decision to participate in the litigation are improper).[9] A district court may regulate communications that threaten the choice of remedies available to class members:

> A district court's duty and authority under Rule 23(d) to protect the integrity of the class and the administration of justice generally is not limited only to those communications that mislead or otherwise threaten to create confusion and to influence the threshold decision whether to remain in the class. Certainly communications that seek or threaten to influence the choice of remedies are ... within a district court's discretion to regulate.

---

tion requirement involves individual inquiries regarding each class member.

**7.** In view of this Court's conclusion that individual issues of causation predominate, Citibank's other arguments against class certification need not be addressed.

**8.** Although Providian added the arbitration clause after this litigation was commenced, it excluded claims asserted by cardholders in lawsuits pending as of the date of the mailed statement. (Declaration of Debra Martinez, dated Feb. 4, 2004 Ex. B: Providian's notice of change to cardholder agreement.)

**9.** Relying upon *Weight Watchers of Philadelphia, Inc. v. Weight Watchers Int'l., Inc.,* 455 F.2d 770, 775 (2d Cir.1972), Defendants argue that they are permitted to contact the absent class members in order to reach settlement. (Def. Arb. Mem. at 15.) However, *Weight Watchers* is distinguishable. There, the defendant's communication with absent class members was supervised by the district court, and the defendant was required to provide advance notice to plaintiff's counsel with an opportunity to comment. 455 F.2d at 772. Defendants' unilateral actions allowed none of these safeguards.

*In re School Asbestos Litig.*, 842 F.2d 671, 683 (3d Cir.1988); *see also Ralph Oldsmobile Inc. v. Gen. Motors Corp.*, No. 99 Civ. 4567(AGS), 2001 WL 1035132, at *2 (S.D.N.Y. Sept.7, 2001) ("[A] court's power to restrict communications between parties and potential class members [ ] appl[ies] even before a class is certified."); *Haffer v. Temple Univ. of the Commonwealth Sys. of Higher Educ.*, 115 F.R.D. 506, 512 (E.D.Pa. 1987) (discussing a court's curative powers after "parties initiate improper communications with class members").

This Court holds that the arbitration clauses may not be enforced because Defendants modified the cardholder agreements after this putative class action was commenced. *See Long v. Fidelity Water Sys., Inc.*, No. C–97–20118 RMW, 2000 WL 989914, at *3 (N.D.Cal. May 26, 2000) (refusing to require arbitration where the agreement was modified after the filing of a putative class action). Regardless of any cardholders' knowledge of this action, Defendants' communication with putative class members was improper because they sought to alter the status of this litigation and the available remedies.

However, arbitration agreements reached between cardholders and Defendants before commencement of this litigation are fully enforceable. *See Currency Conversion*, 265 F.Supp.2d at 403; *see also Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983) (noting the "liberal federal policy favoring arbitration agreements," so that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration"). Further, the arbitration agreement may be enforced by the issuing banks as well as entities bearing a "close relationship" with the issuing banks, such as the issuing banks' parent or subsidiary corporations. *Currency Conversion*, 265 F.Supp.2d at 403.

Defendants argue that cardholders who agreed to enforceable arbitration clauses with their own credit card issuers are estopped from litigating against other Defendants. (Defendants' Reply Memorandum on Arbitration Issue ("Def. Arb. Reply Mem.") at 1–5.) This Court has previously observed that cardholders with enforceable arbitration clauses may bring antitrust claims against non-issuing defendant banks. *Currency Conversion*, 265 F.Supp.2d at 409–10. This is because the non-issuing defendant banks were not parties to those agreements, and the contract provisions did not extend to them. *Currency Conversion*, 265 F.Supp.2d at 410; *In re Humana Inc. Managed Care Litig.*, 285 F.3d 971, 975 (11th Cir.2002), *rev'd on other grounds*, 538 U.S. 401, 123 S.Ct. 1531, 155 L.Ed.2d 578 (2003) ("A plaintiff's allegations of collusive behavior between the signatory and nonsignatory parties to the contract do not automatically compel a court to order arbitration of all of the plaintiff's claims against the nonsignatory defendant.")

In sum, this Court holds that arbitration clauses engrafted on cardholder agreements after this litigation commenced are not enforceable. Conversely, the arbitration agreements entered into before this action are enforceable between the signatories.

## CONCLUSION

For the foregoing reasons, Plaintiffs' motion to certify the proposed antitrust and TILA classes is granted, and Plaintiffs' motion to certify a class with respect to the DTPA claim is denied. This Court certifies a damages class, divided into three subclasses as follows:

a) All cardholders of MasterCard-branded general purpose cards issued by any of the issuing bank defendants who were assessed a foreign transaction fee or surcharge for using such cards to purchase goods and/or services in foreign currencies ("MasterCard Subclass");

b) All cardholders of Visa-branded general purpose cards issued by any of the issuing bank defendants who were assessed a foreign transaction fee or surcharge for using such cards to purchase goods and/or services in foreign currencies ("Visa Subclass"); and

c) All cardholders of general purpose cards issued by Citibank (South Dakota) who were assessed a foreign transaction fee or surcharge for using such cards to

purchase goods and/or services in foreign currencies ("Citibank Subclass").

This Court certifies an antitrust injunctive relief class consisting of all Visa, MasterCard and Diners Club general purpose cardholders. This Court also certifies a TILA class consisting of all Visa, MasterCard and Diners Club general purpose cardholders, divided into seven subclasses, one for each issuing bank.